IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:18-CV-00072-D

| | |
|---|---|
| **Howard Dudley**, | |
| Plaintiff, | |
| v. | **Order** |
| **City of Kinston & A.N. Greene**, in his individual capacity, | |
| Defendants. | |

Plaintiff Howard Dudley spent over two decades in prison until the Wrongful Convictions Clinic at the Duke University School of Law persuaded authorities to vacate his conviction and dismiss the charges against him. He has now sued A.N. Greene and the City of Kinston claiming, among other things, that Greene failed to turn over exculpatory and impeachment evidence to the district attorney who prosecuted Dudley.

As part of discovery, Defendants subpoenaed the Clinic's files on Dudley. The Clinic resisted producing some responsive documents because, it claims, the attorney-client privilege, the work-product doctrine, or both insulate the documents from discovery.

Defendants have asked the court to compel the Clinic to produce the requested records. They argue that Dudley has waived the attorney-client privilege through public statements and the claims in his complaint. And they claim that they are entitled to the Clinic's fact work product because they have a substantial need for it.

After considering the parties' filings and holding a hearing, the court will grant the motion in part and deny it in part. Dudley has waived the attorney-client privilege for certain communications in two ways. First, he has publicly discussed otherwise-confidential attorney-

client communications in public and during a deposition. And second, because of the nature of the claims he brought, he has put certain communications he may have had with his attorneys at issue. So the Clinic will need to produce the relevant portions of responsive documents.

But the Clinic need not produce any of its fact work product. After reviewing the evidence submitted by Defendants and conducting an in-camera review of the withheld documents, the court has determined that Defendants have not shown a substantial need for the Clinic's work product.

The Clinic must supplement its production as required by this order within 10 days from its date of entry. And if any disputes arise after this order, the court will address them directly with the Clinic and the parties.

## I.    Background

For six years, the Clinic worked to overturn Dudley's conviction for a crime he claimed he did not commit: molesting his then-nine-year-old daughter, Amy Moore. Resp. in Opp. at 1, D.E. 111. Its efforts were ultimately successful as Dudley gained his freedom and had the charge dismissed in 2016.

In April 2018, Dudley filed a lawsuit alleging that his conviction resulted from constitutional violations by the City of Kinston and one of its police officers, A.N. Greene. Compl. *passim*, D.E. 1. Among Dudley's claims was an allegation that Greene failed to "disclose exculpatory and impeachment evidence" to the district attorney ahead of Dudley's trial (the *Brady*-related[1] claim). *See, e.g.*, Compl. ¶ 131. The evidence Greene supposedly withheld related to

---

[1] In *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Law enforcement officers can also violate a defendant's due process rights if they suppress evidence that is favorable to a defendant and material to the charges against him. *See Barbee* v. *Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964).

2

information from Paul Porter, Moore's guardian ad litem, and Johnnye Waller, a Lenoir County Social Worker, calling Moore's allegations into question. *Id.* ¶ 9.

The Complaint alleges that in December 1991, months before Dudley's trial, Porter told Greene about an interview he conducted with Moore. *Id.* ¶ 72. During this conversation, Porter allegedly said that he doubted her "reliability and the truthfulness of her allegations." *Id.* ¶ 73. Porter also allegedly shared with Greene his belief that that Moore made up her story and that the molestation never occurred. *Id.* According to the Complaint, Greene never told the District Attorney about Porter's statements. *Id.* ¶ 74.

Dudley also claims that Porter shared his concerns with Waller. *Id.* ¶ 90. According to the Complaint, Waller passed this information along to Greene. *Id.* ¶ 91. Yet Greene supposedly never told the district attorney about his conversation with Waller. *Id.* ¶ 93.

Once discovery began, Defendants subpoenaed the Clinic's records on Dudley. Mot. to Compel Ex. A, D.E. 98–2. One subpoena asked for the "defense file" of Nicholas Harvey, Dudley's trial attorney. D.E. 98–2 at 4. Another sought the Clinic's "investigative file" about Dudley's case. *Id.* at 9. And yet another subpoena sought the files of an attorney who represented Dudley in connection with juvenile matters involving Moore. *Id.* at 14.

Although the Clinic produced many documents, it maintained that the attorney-client privilege and work-product doctrine allowed it to withhold some documents. Defendants disagree.

Instead, Defendants claim Dudley has waived the attorney-client privilege for communications about Porter's concerns in two ways. The first waiver is said to have occurred when Dudley gave a speech at Duke Law School and discussed a conversation he had with his trial attorney about Porter. During the speech, Dudley mentioned that he believed Porter could provide testimony that would help exonerate him. Duke University, *Howard Dudley Embraces His*

*Freedom*, YouTube (April 22, 2016), https://www.youtube.com/watch?v=GX4Lq1qqqyM (last visited Mar. 31, 2021) at 32:55–33:08. So it bothered Dudley when he did not see Porter in the courtroom on the first day of his trial. Dudley said, "I began to ask my lawyer concerning him. And I never really got an answer to why he wasn't there to testify on my behalf." *Id.* 33:12–23.

> Later in his speech, Dudley said,
>
> At some point in time during the trial Mr. Harvey looked at me and said, "This is not going well for you." I said, "Well, what do they have on me?" I wanted to know what am I doing here? What do they have on me? I said, "I don't have a criminal record. There's no evidence." I said, 'Everything that they have, from what I can see, is that Amy made a statement which was false and the only person that could have spoke [sic] on my behalf to prove to this that this it was false, he is nowhere to be seen."

*Id.* 34:24–35:02.

Dudley also recounted a conversation he had with Porter about Porter's interview of Moore. Dudley Dep. Tr. at 57:5–24, D.E. 98–4. According to Dudley, Porter said that he concluded that Moore's mother had coerced her into making allegations against Dudley. *Id.* at 57:16–22. Dudley said that he learned this information and passed it along to his attorney before his criminal trial. *Id.* at 57:1–3, 57:25–8:1, 58:4–5.

The Defendants' second waiver argument focuses on the Complaint's *Brady*-related claim. According to Defendants, whether Dudley or his attorney knew about the allegedly withheld information is a key issue in the case. So, they argue, by bringing the *Brady*-related claim, Dudley has put communications he may have had with his attorney about this topic at issue. Mem in Supp. at 7.

There is also an argument advanced by the Defendants that they are entitled to various notes of interviews the Clinic did with potential witnesses. Even if these documents are work product, the Defendants believe they are entitled to them because they have a substantial need for

them. They once again rely on the importance of any knowledge Dudley and his attorney had about the allegedly withheld evidence. And they claim that they have made other attempts to obtain this information through depositions, but witnesses' memories have faded over time.

The court held an evidentiary hearing on this matter in December 2020. After the hearing, the court asked the Clinic to submit an updated privilege log, which it did.

## II.    Analysis

Resolving this motion requires determining when documents lose the protections of the attorney-client privilege or work-product doctrine. The court will summarize each doctrine and the circumstances that lead to loss of their protections. After laying that groundwork, the court will address the issues raised in the parties' briefs[2] as to why the protections should or should not apply in this case. Ultimately, the law allows Defendants to obtain only some documents they seek from the Clinic.

### A.    Attorney-Client Privilege

The attorney-client privilege is the oldest of the common-law privileges and serves to encourage free communications between attorneys and their clients. *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981). It "affords confidential communications between lawyer and client complete protection from disclosure." *Hawkins* v. *Stables*, 148 F.3d 379, 383 (4th Cir. 1998).

---

[2] Defendants' motion seeks a production of all documents responsive to their subpoenas. D.E. 98. But their supporting brief contains narrower arguments that focus on specific types of documents.  D.E. 98-1. As courts across the nation have done, the court will find that Defendants have waived arguments that they did not raise in their brief.  *See Ohr Somaych/Joseph Tanenbaum Educ. Ctr.* v. *Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y 2020); *Magee* v. *Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003); *Front Range Nesting Bald Eagle Studies* v. *U.S. Fish & Wildlife Svc.*, 353 F. Supp. 3d 1115, 1130 n.9 (D. Colo. 2018); *Mesa Grande Band of Mission Indians* v. *Salazar*, 657 F. Supp. 2d 1169, 1173 (S.D. Cal. 2009).

The Clinic, as the party invoking the privilege, bears the burden of showing that the privilege applies and that Dudley has not waived it. *United States* v. *Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982). To make this showing, it must establish four things. First that the holder of the privilege either was or was seeking to become a client. *NLRB* v. *Interbake Foods, LLC*, 637 F.3d 492, 501–02 (4th Cir. 2011).[3] Second that the person receiving the communication is an attorney (or an attorney's subordinate) and acted as an attorney when they received it. *Id.* Third that the communication relates to facts conveyed by a client outside the presence of strangers and to receiving legal services. *Id.* And fourth that the party has claimed the privilege and not waived it. *Id.*

When assessing whether the privilege applies, the court should not just take the proponent at their word. Instead, "[i]t is incumbent upon the proponent to specifically and factually support his claim of privilege, usually by affidavit . . . and an improperly asserted privilege is the equivalent of no privilege at all." *Byrnes* v. *Jetnet Corp.,* 111 F.R.D. 68, 71 (M.D.N.C. 1986). Conclusory allegations are not enough. *See N. River Ins. Co.* v. *Stefanou*, 831 F.2d 484, 487 (4th Cir. 1987).

Defendants claim that the Clinic cannot meet its burden to show that its communications with Dudley are privileged. They argue that since the privilege does not prevent discovery of facts, they are entitled to any facts in the Clinic's communications with Dudley. They also claim that Dudley has waived the privilege through his public statements and by bringing a *Brady*-related claim that put communications with his attorney at issue.

---

[3] Given that federal law supplies the rules of decision here, federal law applies to privilege issues. Fed. R. Evid. 501.

### 1. Applicability of the Privilege to Documents Containing Facts Alleged in the Complaint.

According to Defendants, "a significant portion" of the subpoenaed materials are not eligible for protection under the attorney-client privilege.[4] Mem. in Supp. at 8. They argue that the attorney-client privilege does not prevent "the disclosure of underlying facts." *Id.* And that the privilege does not apply to information that the defendant has or intends to make public. *Id.* So, according to Defendants, "the privilege does not protect any of the facts alleged in the Complaint, and accordingly" the Clinic should produce "any documents mentioning such facts[.]" *Id.* at 9.

The Clinic largely ignores the Defendants' arguments on this issue. Resp. in Opp. at 8–9, D.E. 111. Instead, it maintains that Dudley has not placed its advice at issue. *Id.* And even though the Defendants did not raise this argument in their brief, the Clinic argues that the Defendants' affirmative defense based on Dudley's actual guilt does not result in a waiver of the privilege.[5] *Id.*

Defendants are correct that not all attorney-client communications are created equal when it comes to their privileged status. Communicating factual information to an attorney does not render that information immune from discovery. *Upjohn*, 449 U.S. at 395–96. Similarly, unprivileged documents do not suddenly gain privileged status because they ended up in an attorney's hands. *In re Allen*, 106 F.3d 582, 604 (4th Cir. 1997). And the privilege does not apply if a client understands or intends that the attorney will share the communicated information with others outside the privileged relationship. *In re Grand Jury Proceedings*, 33 F.3d 342, 354–55 (4th Cir. 1994).

---

[4] Interspersed in this section of Defendants' brief are claims that mimic their other arguments about the waiver occasioned by bringing the *Brady*-related claim. Since the court address those issues elsewhere, it will not address them here.

[5] As noted above, because Defendants did not discuss a waiver caused by their "actual innocence" defense in their initial brief, the court is not addressing it. *See supra* at n.1.

7

But these exceptions do not extend as far as the Defendants would like them to. For example, while a fact conveyed to an attorney is discoverable, the attorney-client communication that conveyed that fact is not. So the privilege does not allow a client to "refuse to disclose any relevant fact . . . merely because he incorporated a statement of such fact into his communication to his attorney.'" *Upjohn*, 449 U.S. at 395–96 (quoting *City of Philadelphia* v. *Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)). But a client cannot "be compelled to answer the question, 'What did you say or write to the attorney?'" *Id.*

So while Dudley could not refuse to respond to discovery requests or deposition questions that involve facts that he communicated to his attorneys, he can refuse to produce the communications themselves. Thus, so long as it is otherwise appropriate, the Clinic can withhold its communications with Dudley even if they contain factual information.

Nor can the court agree that, in general, the privilege offers no protection for communications related to facts in a complaint. Courts have repeatedly rejected the position that the privilege no longer applies simply because a communication involved facts that ended up in a pleading. *See, e.g.*, *United States* v. *Grace*, 455 F. Supp. 2d 1140, 1146 (D. Mont. 2006); *Uniroyal Chem. Co.* v. *Syngenta Crop Prot.*, 224 F.R.D. 53, 56 (D. Conn. 2004); *Burlington Indus.* v. *Exxon Corp.*, 65 F.R.D. 26, 35 (D. Md. 1974). Such a rule would hollow out the privilege's core because there would no longer be any protection for communications about facts at issue in a civil case. So any waiver here would have to stem from Dudley's statements or conduct.

### 2. Waiver of the Attorney-Client privilege

Defendants next assert that the Clinic cannot rely on the attorney-client privilege to withhold documents that relate to "the allegedly exculpatory and impeachment evidence" Dudley and his trial counsel learned from Porter. Mem. in Supp. at 4–5. They argue that Dudley has waived

8

the privilege on that topic by publicly discussing the conversations he had with his trial counsel about Porter. They also claim Dudley impliedly waived the privilege since what he and his attorney knew about Porter's concerns at the time of his trial is relevant to his *Brady*-related claim.

The client, as the holder of the attorney-client privilege, can waive its protections. This wavier can occur either expressly or impliedly. *Hawkins* v. *Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998). A party can waive the privilege by sharing the confidential information with others outside the privileged relationship. *Id.* Waiver can also occur if a client puts privileged matters at issue. *Small* v. *Hunt*, 152 F.R.D. 509, 512 (E.D.N.C. 1994). Regardless of the type of waiver alleged, the party asserting the privilege "must establish . . . that the privilege was not waived." *Jones*, 696 F.2d at 1072; *Zeus Enters.* v. *Alphin Aircraft, Inc.*, 190 F.3d 238, 244 (4th Cir. 1999).

### a)      Waiver by Public Disclosure

Dudley discussed conversations he had with his trial attorney about Paul Porter both in a public speech and his deposition. And Dudley did not just make passing reference to a conversation. Instead, he revealed the substance of those conversations. This type of disclosure constitutes a waiver of the attorney-client privilege. *See ePlus Inc.* v. *Lawson Software, Inc.*, 280 F.R.D. 247, 256 (E.D. Va. 2012) ("Waiver can occur by public revelation."). The Clinic does not argue otherwise.

But determining that Dudley waived the privilege is not the end of the inquiry. The court must determine the waiver's scope. Within the Fourth Circuit, voluntary disclosure "not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure." *Hawkins*, 148 F.3d at 384 n.4. As a result, the privilege will no longer apply to "other communications relating to the same subject matter." *Id.* (quoting *Jones*, 696 F.2d at 1072).

When deciding the bounds of a subject-matter waiver courts should consider "the substance of the protected information that has been publicly disclosed." *E.I. Dupont de Nemours & Co.* v. *Kolon Indus., Inc.*, 269 F.R.D. 600, 607 (E.D. Va. 2010). The statements that led to the wavier of the privilege involve the knowledge that he and his trial counsel had about Porter's concerns about Moore's truthfulness before and during his trial. So Dudley can no longer claim the privilege for communications relating to that subject-matter.

There is also a question over whether the waiver only includes Dudley's communications with his trial counsel or with subsequent attorneys too. Dudley made his public comments about his conversations with his trial counsel after his release in 2016. By making those comments, he lifted the veil of confidentiality that applied to all previous conversations on that topic. So the waiver applies to any attorney-client communications with any attorneys on that subject matter until then.[6] And, again, the Clinic does not argue otherwise. So the Clinic cannot assert the attorney-client privilege over any documents dealing with the subject-matter of the waiver, regardless of the attorney involved in the communication.

### 3.    At-Issue Waiver of the Attorney-Client Privilege

Defendants also argue that Dudley waived the privilege by placing what he and his attorney knew about the allegedly withheld information at issue. They maintain that if Dudley or his trial counsel knew that information, then he cannot prevail on his *Brady*-related claim. So, the argument goes, Dudley cannot use the attorney-client privilege to shield this information from discovery. Defendants specifically focus on "allegedly exculpatory information from Amy Moore's guardian ad litem Paul Porter" that was known by Dudley or his trial counsel.[7] Mem. in Supp. at 7 n.4 & 8,

---

[6] Given the temporal scope of the documents at issue, the court need not address whether the waiver applies prospectively.

[7] In a footnote, Defendants also claim that knowledge of his post-conviction counsel is at issue. If a party relegates an argument to a footnote, courts may choose to not address it. *Gregorio* v. *Hoover*, 238 F. Supp. 3d 37, 43 n.7

98–1.

Federal courts recognize that a client can waive the attorney-client privilege by placing the otherwise confidential communication at issue in litigation. *Small* v. *Hunt*, 152 F.R.D. 509, 512 (E.D.N.C. 1994). And Defendants claim that two cases that federal courts regularly look to when assessing if an at-issue waiver occurred—*Hearn* v. *Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975), and *Rhone-Poulenc Rorer Inc.,* v. *Home Indem. Co.*, 32 F.3d 851 (3rd Cir. 1994)—weigh in their favor.[8]

The Clinic's brief does not mention either of these tests. Instead, it relies on a blanket assertion that the Clinic's advice is not at issue and argues about the unraised issue of an actual guilt defense. Resp. in Opp. at 8–9.

The analysis of this issue will proceed in two parts. To begin with the court will review the elements of Dudley's *Brady*-based claim to determine what facts are at issue. Then the court will consider whether either *Hearn* or *Rhone-Poulenc* support finding an at issue waiver.

### a)     Elements of Dudley's *Brady*-Related Claim

Determining whether counsel's advice is at issue requires looking at what Dudley needs to prove to prevail on his Brady-based claim. A due process claim based on the allegation that an officer suppressed evidence favorable to a defendant has three elements. First, that "the evidence at issue was favorable to him[.]" *Owens* v. *Baltimore City State's Attorneys Off.*, 767 F.3d 379, 396 (4th Cir. 2014). Second, that the officer "suppressed the evidence in bad faith[.]" *Id.* And third, that "prejudice ensued." *Id.* at 396-97.

---

(D.D.C. 2017); *Weslowski* v. *Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015). Given importance of the attorney-client privilege, the court declines to address this argument without it being fully developed in Defendants' brief.
[8] While the Fourth Circuit has cited *Rhone-Poulenc* with approval, it has not formally adopted one of these tests. *United States ex rel. Drakeford* v. *Tuomey*, 792 F.3d 364, 377 n.8 (4th Cir. 2015).

The second factor is particularly relevant to this motion. Courts have noted that even when an officer does not turn evidence over to the prosecutor "suppression does not occur when a criminal defendant is already aware of the exculpatory information. *Burgess* v. *Baltimore Police Dep't,* 300 F. Supp. 3d 696, 704 (D. Md. 2018) (citing *Barnes* v. *Thompson*, 58 F.3d 971, 975–76 (4th Cir. 1995); *Stockton* v. *Murray*, 41 F.3d 920, 927 (4th Cir. 1994)). *Accord United States* v. *Parker*, 790 F.3d 550, 562 (4th Cir. 2015) ("[A] *Brady* violation has not occurred if the defense is aware, or should have been aware, of impeachment evidence in time to use it in a reasonable and effective manner at trial."); *United States* v. *Catone*, 769 F.3d 866, 872 (4th Cir. 2014) ("[T]o establish a Brady violation, the exculpatory material must be known to the government but not to the defendant."). So if Dudley or his attorney knew of the allegedly withheld evidence, Dudley's *Brady*-related claim will fail.

### b)    The *Hearn* Test

The *Hearn* test focuses on three issues. To begin with, a court should consider whether the "assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party[.]" *Hearn*, 68 F.R.D. at 581. The next question is whether "through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case[.]" *Id.* And finally, the court looks to whether "application of the privilege would have denied the opposing party access to information vital to his defense." *Id.*

All three *Hearn* factors are satisfied here. Dudley's claim of privilege has arisen because of the suit he filed. And, as noted above, there is no *Brady* violation if the defendant or his attorney knew of the allegedly withheld evidence. So this information is relevant to Dudley's claim. Moreover, given the importance of awareness by Dudley or his attorney of the allegedly withheld information, denying Defendants access to this information would deprive them of information

12

vital to their defense.

The Clinic responds that the court should not find a waiver because "Dudley has not injected the Clinic's privileged communications into the present lawsuit." Resp. in Opp. at 8. It also argues that Dudley's "claims are not based on the Clinic's legal advice." *Id.*

But *Hearn* doesn't ask if claims are based on an attorney's legal advice. Instead, it focuses on whether Dudley has put "protected information at issue" in this case. *Hearn*, 68 F.R.D. at 581. And as discussed above, his knowledge and the knowledge of his trial counsel are directly at issue. So, under *Hearn*, an at-issue waiver has occurred.

### c) The *Rhone-Poulenc* Test

Like *Hearn*, *Rhone* recognized that a client could waive the attorney-client privilege by putting privileged matters at issue. *Rhone-Poulenc*, 32 F.3d at 863. But *Rhone* parts company with *Hearn* over when that waiver occurs. While *Hearn* makes the privileged information's relevance the determinative factor in the analysis, *Rhone* does not. *Id.* ("Advice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner."). The Third Circuit objected to the use of *Hearn* to get at privileged communications simply because the "the client's state of mind may be in issue in the litigation[.]" *Id.* Instead, in the Third Circuit's view, a waiver occurs only if the party asserting the privilege makes use of the privileged information, like when it "attempts to prove [a] claim or defense by disclosing or describing an attorney client communication." *Id.*

The court looked to patent law for an example. The Court of Appeals explained that an at-issue waiver would not arise simply because there was an allegation that the infringer acted willfully. *Id.* In that situation, "the advice of the infringer's lawyer may be relevant to the question of whether the infringer acted with a willful state of mind." *Id.* But that would not be enough to

waive the privilege. *Id.* To do that, the infringer must attempt "to limit its liability by describing that advice and by asserting that he relied on that advice." *Id.*

So under *Rhone*, the court must look at whether Dudley's *Brady*-related claim requires him to make use of privileged information to prove it. Dudley bears the burden of establishing that suppression occurred. *See Owens*, 767 F.3d at 396 (explaining that the plaintiff "must allege, and ultimately prove," the elements of a *Brady*-related withholding claim). And to do that he will eventually need to show that neither he nor his attorney knew about the allegedly withheld information. *See Nayab* v. *Capital One Bank (USA), N.A.*, 942 F.3d 480 (9th Cir. 2019) ("It is a general rule of evidence . . . that 'where the subject-matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party.'"); *Allstate Fin. Corp.* v. *Zimmerman*, 330 F.2d 740, 744 (5th Cir. 1964).

Since Dudley will need to rely on privileged information to prove his claim, *Rhone* suggests that he has waived the attorney-client privilege by putting his attorney's advice at issue.

### d) Conclusion on Existence of an At-Issue Waiver

Based on both *Hearn* and *Rhone*, the court finds that Dudley has placed attorney-client communications about the allegedly withheld information at issue. As a result, he has waived the attorney-client privilege for communications on that topic. This waiver extends to all communications on those topics with all attorneys who have represented Dudley. Thus the Clinic cannot withhold documents involving that subject matter based on the attorney-client privilege.[9]

---

[9] If appropriate, the Clinic may withhold all or parts of documents under the work-product doctrine.

14

### B.    Work-Product Doctrine

Under the work-product doctrine, documents prepared "in anticipation of litigation . . . by or for another party or its representative" are generally not discoverable. Fed. R. Civ. P. 26(b)(3)(A). Courts have distinguished between two types of attorney work product: fact work product and opinion work product. *In re Grand Jury Proceeding*, 102 F.3d 748, 750 (4th Cir. 1996)

Fact work product "consists of documents prepared by an attorney that do not contain the attorney's mental impressions[.]" *In re Grand Jury Proceedings*, 401 F.3d 247, 250 (4th Cir. 2005). This type of work product is only entitled to qualified protection and "can be discovered upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *Id.*

Opinion work product, on the other hand, contains an attorney's "mental impressions, opinions, and legal theories[.]" *Duplan Corp.* v. *Deering Milliken, Inc.*, 540 F.2d 1215, 1223 (4th Cir. 1976). Work product falling into this category is "more scrupulously protected as it represents the actual thoughts and impressions of the attorney." *In re Grand Jury Proceedings*, 401 F.3d at 250. It is discoverable "only in very rare and extraordinary circumstances." *In re Doe*, 662 F.2d 1073, 1080 (4th Cir. 1981).

As with the attorney-client privilege, the burden first rests on the party resisting discovery to show that the work-product doctrine applies to a document. *Republican Party of N.C.* v. *Martin*, 136 F.R.D. 421, 430 (E.D.N.C. 1991). If it does, the burden then shifts to the requesting party "to show, as to each document, substantial need and undue hardship." *Id.* at 429.

### 1.    Documents Sought by Defendants

The court must first determine what documents the Defendants are asking it to make the Clinic produce. Their brief is vague on this point. For example, they "assert that some of the items"

Case 4:18-cv-00072-D   Document 239   Filed 03/31/21   Page 15 of 21

the Clinic is withholding "are not protected by the work-product doctrine." Mem. in Supp. at 10. But they do not state—or even hint at—which items they claim the doctrine does not apply to.

And the Defendants say that they "seek documents in the" Clinic's "investigative files such as its communications" with various people connected to Dudley's case. *Id.* But they do not specify the scope of documents they seek. Although they do suggest that certain witness statements may be fact work-product that are discoverable under the substantial need exception. *Id*.

Since Defendants have the burden to establish that there is a substantial need for work product, the court believes they also have the burden to clearly articulate the documents they seek to withdraw from the doctrine's protections. Given the discussion in their brief, the court finds that Defendants are requesting the production of fact-work product involving communications with the individuals named in their brief on whether Dudley or his trial counsel knew of the facts that Dudley now alleges Greene withheld. Thus the court will assess whether they have established a substantial need for such documents.

## 2. Whether a Substantial Need Exists for Production of Fact Work Product

The Defendants have a substantial need for these documents, they claim, because as with the attorney-client privilege, the information known to Dudley and his trial attorney is relevant to his *Brady* claim. And they claim they have been unable to "secure the substantial equivalent of the materials by alternate means without undue hardship" since they have unsuccessfully tried to subpoena this information from Dudley's prior attorneys.[10] At the hearing on this motion, they also claimed that deposition testimony has shown that various witnesses' memories have faded.

The Clinic disagrees. In its brief, it argues that the Defendants have not provided the court with anything more than a conclusory assertion that they have a substantial need for this

---

[10] Although exactly what materials they are referring to is unclear.

information. And the Clinic also asserts that Defendants don't need to riffle through its files because they can depose most of the people they mentioned in their brief.

The Clinic candidly admits that the Defendants cannot take this tact with Porter, since he died several years ago. But the Clinic has already given Defendants a recording of its interview with Porter that occurred shortly before his death. So, in the Clinic's view, that should be enough. Finally, the Clinic says that it has no more relevant information than Dudley's prior attorneys, so there is no need to look at the Clinic's work product.

So what exactly constitutes a need substantial enough that it justifies disclosing an attorney's fact work product? The Advisory Committee Notes to Rule 26 provide three factors courts should consider when assessing whether special needs justify disclosure of fact work product. First, the "importance of the materials to the party seeking them for case preparation[.]" Fed. R. Civ. P. 26 advisory committee's notes to 1970 amendments subdivision (b)(3). Second, "the difficulty the party will have obtaining them by other means[.]" *Id.* And third, "the likelihood that the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents he seeks." *Id.*

The Defendants claim that the work product might contain important information. The Clinic does not argue otherwise. So the dispute here centers on the latter two factors.

On the remaining issues, the Clinic's argument that in most cases the Defendants can just depose the witnesses to get the information they want is a fair one. Courts prefer that a party try to obtain information through a deposition before resorting to discovery of fact work product. *Suggs* v. *Whitaker*, 152 F.R.D. 501, 507 (M.D.N.C. 1993).

But a deposition may not be a fruitful source of information if many years have passed since the events in question. So courts also recognize that "if a party or witness has no recollection

17

of the events" at issue "this loss of memory constitutes an inability to obtain the substantial equivalent of the facts in the report by other means." *Id.* (citing *Phillips* v. *Dallas Carriers Corp.*, 133 F.R.D. 475, 481 (M.D. N.C. 1990). The Advisory Committee Notes also recognize that "a lapse of memory" may justify a finding of substantial need. Fed. R. Civ. P. 26 advisory committee's notes to 1970 amendments subdivision (b)(3).

The Defendants have argued and presented evidence that some people mentioned in their brief no longer remember the events at issue. So the court will look to whether, based on the evidence, Defendants are entitled to the requested documents.

### a) Insufficient Showing of Substantial Need

For several individuals, Defendants presented no evidence supporting their claim of a substantial need for fact-work product. Because of that shortcoming, the court will not require the Clinic to produce any of its fact work product for Amy Moore, Joretta Durant, the North Carolina Center on Actual Innocence, and Judge Paul Jones.

### b) Dal Wooten

Dal Wooten, one of Dudley's post-conviction attorneys, testified that he does not remember if James Perry, another one of Dudley's attorneys, explained why Porter would not allow an interview of Moore to take place. Wooten Dep. at 66:17–20. This lapse in memory does not relate to evidence Greene allegedly withheld. And, in any event, none of the Wooten-related documents on the privilege log relate to that issue.[11] So the court finds that Defendants have not established a substantial need for the Clinic's fact work product related to Wooten.

---

[11] Defendants' brief mentions an interview between the Wooten and the Clinic, but the privileged documents submitted to the court do not appear to contain any documents related to that event.

Case 4:18-cv-00072-D   Document 239   Filed 03/31/21   Page 18 of 21

### c)  James Perry

The transcript from Perry's deposition reflects that he remembers almost nothing about his representation of Dudley. Perry Dep. *passim*. Several Perry-related documents on the privilege log are opinion work-product, and thus not discoverable even if Defendants have a substantial need for them. *See* Docs. 402–404[12], Duke_003125, Duke_003129, Duke_003155, Duke_003161. None of the remaining Perry-related documents relate to the allegedly concealed issues. *See* Docs. 405, 408, 413, 414, 415, 416, 643. So the court finds that Defendants have not established a substantial need for the Clinic's fact work product related to Perry.

### d)  Paul Porter

The Clinic spoke with Paul Porter more than once before his death. One document in the Clinic's file memorializes a conversation its staff had with him in November 2012. Doc. 429. The Clinic provided Defendants with a recording of that interview, so there is no substantial need to produce that document. And the remaining two documents (Docs. 509 and 895) provide no insight into whether Dudley or his attorney knew of Porter's concerns before trial. So the court finds that Defendants have not established a substantial need for the Clinic's fact work product related to Porter.

### e)  Nicholas Harvey

Harvey was able to answer many questions posed during his deposition. He said he was unaware of Porter's concerns about Moore's allegations ahead of Dudley's trial. Harvey Dep. at 10:12–11:9. He was also sure that he had not received a report prepared by Waller before or during

---

[12] Most of the document identification numbers on the privilege log begin with DUKE-PRIV-. For ease of reference, the court will omit this prefatory language. If a document begins with another prefix, the court will note it.

Dudley's trial. *Id.* 10:9–11. But he could not recall whether Dudley had told him about conversations Dudley had with Porter. *Id.* 31:21–32:8, 32:23–33:13, 33:19–25, 34:6–10. Thus, he has a lapse of memory on these issues.

A November 2011 memo recounts a conversation a member of the Clinic staff had with Harvey. *See* Doc. 634. The memo does not address whether Dudley told Harvey about his conversations with Porter. So the court finds that Defendants have not established a substantial need for the Clinic's fact work product about Harvey.

### f)        Johnnye Waller

According to her deposition testimony, Waller also had no independent recollection about her investigation into Amy Moore's claims. Waller Dep. at 59:19–60:16. She says she also does not remember Amy Moore, Dudley, or Greene. D.E. 62:13–25. She also has no recollection of conversations with Greene or the Kinston Police Department. *Id.* 102:2–138:16.

There are two copies of a memo in the Clinic's files that recount an interview with Waller by Clinic staff. Doc. 397, 940. There is no information in this memorandum about Waller speaking with Greene about Porter's concerns or any other information Greene allegedly withheld. So the court finds that Defendants have not established a substantial need for the Clinic's fact work product related to Waller.

## III.        Conclusion

For the reasons stated above, Defendants' motion to enforce their subpoenas to the Clinic is granted in part and denied in part. The court orders the following:

1. Within 10 days from the date of entry of this order, the Clinic must produce documents previously withheld based on the attorney-client privilege that contain communications about knowledge Dudley or his attorneys had about

   a. Exculpatory or impeachment evidence the Complaint alleges Greene withheld; and

   b. Exculpatory or impeachment evidence identified during the discovery process that Dudley claims Greene withheld.

2. To the extent that this order requires production of only a portion of a document, the Clinic should produce that portion and may redact the rest.

3. When the clinic produces these documents, it must also provide Defendants with an updated privilege log to reflect documents still withheld and any redactions in produced documents.

4. Within one week after the Clinic produces these documents Defendants and the Clinic must meet and confer about any disputes over whether the Clinic has produced all documents required by this order.

5. If disputes still exist after the meet and confer process, the parties should notify the court and it will schedule a hearing to resolve the disputes.

6. Each party will bear their own costs.

Dated: March 31, 2021

Robert T. Numbers, II
United States Magistrate Judge